# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EMC OUTDOOR, LLC** | : | **CIVIL ACTION** |
| *Plaintiff/Counterclaim Defendant* | : | |
| | : | **NO. 17-5172** |
| **v.** | : | |
| | : | |
| **JENNIFER STUART**, *et al.* | : | |
| *Defendants/Counterclaim Plaintiffs* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                    MARCH 31, 2021

# MEMORANDUM OPINION

## INTRODUCTION

Plaintiff EMC Outdoor, LLC ("EMC") filed this civil action against former employees, Defendants Jennifer Stuart ("Stuart") and Mary Jo Pittera ("Pittera"), and their subsequent employer, Defendant Grandesign ("Grandesign") (collectively, "Defendants"), asserting, *inter alia*, claims of a breach of contract pertaining to its former employees' obligations under their employment agreements and restrictive covenants therein, particularly, as related to confidential information or trade secrets. [ECF 67]. Before this Court is Defendants' motion for summary judgment[1] on all claims against them, filed pursuant to Federal Rule of Civil Procedure ("Rule") 56, [ECF 107], EMC's response in opposition, [ECF 110], and Defendants' reply. [ECF 113]. The issues raised in the motion are fully briefed and ripe for disposition. For the reasons set forth herein, the motion is granted, *in part*, and denied, *in part*, as set forth in the accompanying Order.

---

[1]     EMC also filed a partial motion for summary judgment, [ECF 108], which will be addressed in a separate Order.

**DISCUSSION**

Rule 56 governs summary judgment motion practice.  Specifically, Rule 56 provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if its existence or non-existence might affect the outcome of the case, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Under Rule 56, the court must view the evidence in the light most favorable to the non-movant (here, EMC).  *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011).

The movant bears the initial burden of identifying evidence that "demonstrate[s] the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004).  Once the movant has met its initial burden, the non-movant must rebut the motion by identifying "some evidence in the record that creates a genuine issue of material fact."  *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).  In doing so, the non-movant must rely on facts in the record and "cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument[,]" *id.*, or on "bare assertions, conclusory allegations[,] or suspicions." *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). If the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,]" then the court should grant summary judgment for the movant.  *Celotex*, 477 U.S. at 322.

As noted, Defendants move for summary judgment on all claims against them.  In sum, Defendants argue:

While EMC has asserted a panoply of claims against all the defendants, virtually all of them require the Court's initial determination of two related issues. The first is whether Stuart was terminated by EMC. If, in fact, Stuart was fired by EMC, she was contractually relieved of her obligations under her restrictive covenants. Next, if Stuart was fired and thus relieved her of her restrictive covenants, EMC cannot, as a matter of law, contend that business information no longer protected could constitute trade secrets under Pennsylvania and Federal law. Accordingly, if that information could not be deemed a trade secret, most of EMC's claims against Stuart, Pittera[,] and Grandesign necessarily fail.

Def. Br., ECF 107 at 2. This Court will address Defendants' various arguments and EMC's responses thereto, in turn.

### I. Count IV- Breach of Contract

At Count IV of the amended complaint, EMC asserts a claim for breach of contract against Stuart.[2] Specifically, EMC contends that Stuart breached the non-compete and non-solicitation clauses in her employment contract. In response, Stuart argues that her alleged conduct, even if true, did not constitute a breach of contract because those provisions do not apply where EMC terminated Stuart's employment.

The undisputed facts relevant to this contract claim are as follows:

In May of 2014, after a period of negotiation, EMC and Stuart entered into an employment agreement, the content and validity of which are not disputed. On October 25, 2017, EMC's President, Jennifer Horrocks, informed Stuart via a phone call that EMC was terminating Stuart's employment. Def. Br., ECF 107, Ex. D (McLarney Dep.), at 75. Prior to that phone call, Horrocks and EMC's owner, Betsy McLarney, "discuss[ed] the fact that [they] would be terminating Ms. Stuart's employment on that call[.]" *Id.* at 75-76. Two days after the phone call, Horrocks sent Stuart a letter from EMC which read, in relevant part: "Dear Jen, Your employment is terminated effective October 25, 2017." Def. Br., ECF 107, Ex. B (Letter from Horrocks to Stuart). The letter also indicated that EMC would pay Stuart severance. In EMC's response to Defendants' statement of undisputed facts, EMC indicated that the following statement is "[u]ndisputed": "Stuart was fired by EMC on October 25, 2017[.]" Plf. Resp. to Def. Statement of Facts, ECF 110-1, at ¶ 6.

---

[2]    "To state a claim for breach of contract under Pennsylvania law, a plaintiff must allege three things: (1) the existence of a contract, including its essential terms; (2) a breach of duty imposed by the contract; and (3) resultant damages." *Alpart v. General Land Ptnrs, Inc.*, 574 F. Supp. 2d 491, 502 (E.D. Pa. 2008) (citing *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).

Further, Horrocks testified at her deposition as follows:
    Q. 'You fired [Stuart], correct?'
    A. 'Yes.'
    Q. 'There is no dispute that [Stuart] was fired by EMC, correct?'
    A. 'There is no dispute that we terminated Jen's employment.
 Def. Br., ECF 107, Ex. E (Horrocks Dep.), at 43-44.

Additionally, for the purposes of this motion, this Court will assume that Stuart engaged in the various conduct that EMC alleges she engaged in after her termination,[3] which EMC contends amounts to violations of the restrictive covenants in Section 5 of Stuart's employment contract. This Court makes these assumptions in accordance with its obligation to view the evidence in the light most favorable to the non-movant (here, EMC). *Galena*, 638 F.3d at 196.

In its response, EMC contends that there are factual disputes regarding Stuart's alleged breach of contract that render Defendants' request for summary judgment inappropriate on this claim. EMC is, however, mistaken. The dispute between the parties is actually one of law, not of fact, which is for this Court to resolve. Clearly, as indicated by the relevant facts summarized above, the parties do not dispute the fact that EMC terminated Stuart's employment. Rather, the parties' arguments are focused on the meaning and effect of a particular provision in Stuart's employment contract: Section 12. This section provides, in relevant part: "Upon termination, all obligations of [EMC] and Employee under this Agreement will cease as of the date of termination. Employee's obligations under Sections 5 and 6 and under Exhibit B shall survive willful termination of employment by Employee only."[4] Def. Br., ECF 107, Ex. A (Stuart's Employment Contract), at 49.

---

[3]     The only mention EMC makes of any conduct by Stuart *prior* to her termination is: "Prior to her termination on October 25, 2017, Stuart readily admits she had 'multiple conversations with . . . Pittera about joining Grandesign' and 'multiple conversations with Grandesign about joining the company.'" Plf. Resp. Br., ECF 110 at 6.

[4]     Section 5 of Stuart's employment contract is titled "Protective Covenants" and contains the non-compete and non-solicitation provisions that EMC claims Stuart violated. Both the non-compete and non-

Specifically, the parties disagree over the meaning of the phrase "willful termination of employment by Employee only" in Section 12.  Stuart argues that the plain meaning of the phrase is that it refers to the employee willfully choosing to end her employment, such as when an employee quits or resigns.  In contrast, EMC argues that the inclusion of the word "willful" means that the phrase includes a situation where the employee willfully engages in conduct that leads to EMC terminating or firing her.  To stress its position, EMC argues that Stuart could "willfully terminate[] her employment by intentionally failing to perform to the best of her ability and by creating a toxic work environment at EMC."  Plf. Resp. Br., ECF 110 at 5.  EMC's argument, while creative, is not supported by established rules of contract interpretation.

It is well-settled that the first and most important rule to apply in contract interpretation, under Pennsylvania law, is the Plain Meaning Rule.  As articulated by the Pennsylvania Supreme Court,

> the [Plain Meaning Rule] has been supported as generally best serving the ascertainment of the contracting parties' mutual intent.  When the parties have reduced their agreement to writing, the writing is to be taken to be the final expression of their intention.  Where the contract evidences care in its preparation, it will be presumed that its words were employed deliberately and with intention.  In determining what the parties intended by their contract, the law must look to what they clearly expressed. Courts in interpreting a contract do not assume that its language was chosen carelessly.  Neither can it be assumed that the parties were ignorant of the meaning of the language employed.

*Steuart v. McChesney*, 498 Pa. 45, 51-52 (1982) (internal quotations and citations omitted).  Further, "[i]t is axiomatic that the language used in a contract is normally to be given its ordinary meaning in the absence of evidence of some special meaning."  *Light v. Miller*, 450 A.2d 51, 53 (Pa. Super. Ct. 1982); *see also Wert v. Manorcare of Carlisle PA, LLC*, 633 Pa. 260, 279 (Pa.

---

solicitation provisions indicate that the requirements they prescribe shall remain in effect for a period of "one year after the date Employee's employment with [EMC] ends or is terminated for any reason."  *Id*. at 44-47.

2015) ("Unless otherwise specified, a contract's language shall be given its plain and ordinary meaning."). "The fact that the parties do not agree upon a single interpretation does not necessarily render a contract ambiguous." *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. Super. Ct. 1993).

Here, there is nothing ambiguous about the phrase in question ("willful termination of employment by Employee only"). Stuart argues, and this Court agrees, that the plain meaning of the phrase is the factual circumstance of an *employee* choosing to terminate, or end, his or her employment. The operative action is embodied in the word "termination," which the parties and this Court agree means the act of ending or ceasing, in this case, an employee's employment. Importantly, there is only one actor contemplated in the phrase: the employee. Thus, the employee is the actor that must do the action ascribed: terminate his or her employment. In modern language, an employee terminating his or her employment is frequently referred to as "quitting" or "resigning"; however, the specific words used when an employee terminates his or her employment are not relevant here. Rather, the actor—not the action—is the dispositive, determinative word in terms of revealing the meaning of the phrase. A person's employment can be terminated by either (1) his or her own action or (2) the action of his or her employer. The phrase "willful termination of employment by Employee only" clearly describes the former: the act of an employee ending his or her employment.

EMC makes arguments regarding the meaning of the word "willful," but EMC's focus is misplaced. The word "willful" is an adjective that describes the action (termination); it does not change the meaning of the action it describes, nor does it affect the identified actor responsible for completing the action. In sum, the plain language meaning of the phrase "willful termination of employment by Employee only" is the circumstance of an *employee* ending his or her employment,

*only*.  In the larger context of Section 12, this means that Stuart's "obligations under Sections 5 and 6 and under Exhibit B" *only* survive if/when Stuart terminates her employment with EMC. The exclusionary word "only" implies that Stuart's obligations under the relevant sections do not survive *any* circumstances other than the one specifically described (*i.e.*, where Stuart resigns). Thus, application of the Plain Meaning Rule dictates that Stuart's obligations under Sections 5 and 6 of her employment contract do not survive EMC's termination of Stuart's employment.

As implored by the court in *Steuart*, this Court will presume that the contract's "words were employed deliberately and with intention" and will "not assume that its language was chosen carelessly[,]" nor "assume[] that the parties were ignorant of the meaning of the language employed." 498 Pa. at 51-52.  Having found the meaning of the phrase in Section 12 unambiguous, this Court is not permitted to consider extrinsic evidence to determine the phrase's meaning. *See id.* at 48-49 ("when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement"; "where language is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as manifestly expressed, rather than as, perhaps, silently intended."); *see also* 1 Corbin on Pennsylvania Contracts § 24.01 (2020) ("Where contract language is clear, the court is limited to a review of the terms expressed within the four corners of the document and may not consider extrinsic evidence." (citing *Steuart*, 498 Pa. at 49)); *Meyer-Chatfield v. Century Bus. Servicing, Inc.*, 732 F. Supp. 2d 514, 519 (E.D. Pa. 2010) ("Under the parol evidence rule, where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, *but the only, evidence* of their agreement . . . and its terms and agreements cannot be added to nor subtracted from by parol evidence." (quoting *Yocca v. Pittsburgh Steelers Sports, Inc.*, 578 Pa. 479, 854 (Pa. 2004))).

Therefore, this Court will not consider the various extrinsic evidence offered by the parties *regarding the meaning of the phrase in Section 12*.

Notwithstanding the clear and plain meaning of the disputed language in Section 12, EMC nevertheless argues that the plain meaning interpretation is "inconsistent with [the contract's] other provisions." Plf. Resp. Br., ECF 110 at 7.  Specifically, EMC argues that this interpretation of Section 12 contradicts the plain language in Section 5, which indicates that the non-compete and non-solicitation obligations apply for one year after Stuart's "employment with [EMC] ends or is terminated for any reason." Def. Br., ECF 107, Ex. A (Stuart's Employment Contract), at 44-47. Thus, the apparent contradiction between Section 5 and Section 12 is whether the non-compete and non-solicitation clauses in Section 5 remain in effect when Stuart's employment with EMC ends, either (1) regardless of the circumstances of her departure or (2) only if/when Stuart resigns. As noted, Section 12 provides that the obligations in Section 5 only survive the end of Stuart's employment if Stuart, herself, resigns.  Section 5's non-compete and non-solicitation provisions indicate that the obligations defined therein shall remain in effect for a period of "one year after the date Employee's employment with [EMC] ends or is terminated *for any reason*." Def. Br., ECF 107, Ex. A (Stuart's Employment Contract), at 44-47 (emphasis added).  Even assuming for the purposes of this decision that this perceived inconsistency creates an ambiguity, established rules of contract interpretation and construction resolve the inconsistency in Stuart's favor and consistent with this Court's plain meaning interpretation set forth above.  *See Pure Earth, Inc. v. Call*, 2021 U.S. Dist. LEXIS 38178, at *137 (E.D. Pa. March 21, 2012) (identifying two contract provisions as inconsistent with each other and holding "[i]n order to resolve this inconsistency, we turn to canons of construction."); *Sahrapour v. Lesron, LLC*, 119 A.3d 704, 717 (D.C. App. July 9, 2015) ("The canon that 'specific terms and exact terms are given greater weight than general

language' resolves [the identified] inconsistency [between two terms]." (citing Restatement (Second) of Contracts § 203(c)).

"In particular, the canons of construction regarding general contract provisions and specific contract provisions are germane. . . . If the apparent inconsistency is between a clause that is general . . . and one that is more limited and specific in its coverage, the more specific term should usually be held to prevail over the more general term." *Pure Earth, Inc.*, 2021 U.S. Dist. LEXIS 38178, at *137-38 (internal quotations and citations omitted); *see also Zoological Soc'y v. INTECH Constr., Inc.*, 48 Pa. D. & C. 4th 542, 550 (Pa. C.P. May 16, 2000) ("Where specific or exact terms appear to conflict with broader or more general terms, the former is more likely to express the meaning of the parties with respect to the situation than the general language." (citing *PBS Coal v. Hardhat Mining*, 429 Pa. Super. 372, 378 (1993))); *Trombetta v. Raymond James Fin. Servs.*, 907 A.2d 550, 560 (Pa. Super. Ct. 2006) ("Furthermore, the specific controls the general when interpreting a contract." (citing *Baltic Dev. Co. v. Jiffy Enterprises, Inc.*, 435 Pa. 411, 416 (1969)).

Here, the provisions of Section 12 are more specific in terms of its applicability and defines the scope and applicability of the restrictive covenants in Section 5, which in turns, details the restrictive covenants and indicates that they apply generally, under any circumstances where Stuart's employment ends.  Thus, Section 5 provides the general scope of the restrictive covenants. In contrast, Section 12 only applies under one specific set of circumstances: if/when Stuart resigns. Section 12 essentially defines the scope of applicability for the substantive provisions in Section 5 by identifying an exception, a set of factual circumstances under which the restrictive covenants would not apply (*i.e.*, if/when EMC fires Stuart).  In other words, Section 5 provides the default, general rule for when the restrictive covenants apply and Section 12 provides a specific exception

to that general rule.  Thus, Section 12's terms prevail over any contradictory term in Section 5.[5]

Accordingly, consistent with this Court's plain meaning interpretation, the restrictive covenants in

Section 5 only survive the end of Stuart's employment if Stuart resigns or quits.

Notably, EMC identified an additional rule of construction that affirms this Court's plain

meaning interpretation of Section 12.  EMC correctly noted that "one part of a contract cannot be

so interpreted as to annul another part . . . [and contracts] must be interpreted as a whole."  *Charles*

*D. Stein Revocable Trust v. General Felt Indus.*, 749 A.2d 978, 980 (Pa. Super. Ct. 2000) (quoting

*Village Beer & Bev. v. Vernon D. Cox & Co.*, 475 A.2d at 121 (Pa. Super. Ct. 1984) (internal

quotations and alterations omitted)).  However, contrary to EMC's contention, the above-described

interpretation of Section 12 does not nullify Section 5, nor does it render Section 5 superfluous.

Rather, Section 12 identifies the specific circumstances under which Stuart's obligations

prescribed by Section 5 would survive the end of her employment with EMC.  Thus, Section 12

further defines the scope of applicability for the obligations detailed in Section 5.  For example, if

Stuart resigned from EMC, then Section 12 dictates that Stuart would have the obligations

described in Section 5; if Stuart was fired by EMC, then Section 12 dictates that Stuart would not

have any of the obligations described in Section 5.  Because Section 12 depends on the existence

---

[5]    *See, e.g., Pure Earth, Inc.*, 2021 U.S. Dist. LEXIS 38178, at *137-40 (where one term in a contract indicated the parties' performances were independent and another contradictory term indicated that the parties' performances were dependent, the specific-over-general canon dictated that the independent provision was "general" because it referred to a broad, inclusive list of circumstances and the dependent provision was "specific" because it referred only to two, specified circumstances (that were, themselves, also explicitly listed in the broad, inclusive list of circumstances in the independent provision); resolving the ambiguity/contradiction between the terms by ruling the specific provision prevailed); *see also Zoological Soc'y*, 48 Pa. D. & C. 4th at 550-551 (where one term stated that a rule applied to "<u>any</u> controversy or claim arising out of" the contract, and another contradictory term stated that the same rule only applied to "controversies and claims having a dollar value not exceeding the sum of $100,000", the specific-over-general canon dictated that the latter provision was more specific and <u>"limited the scope" of the former provision</u>; resolving the ambiguity/contradiction between the terms by ruling the specific provision prevailed) (emphasis added).

of Section 5, and specifically invokes the contents of Section 5 under certain factual circumstances, it cannot be said that Section 12 annuls, nullifies, or renders superfluous Section 5.

Further, in its analysis, this Court has also considered another pertinent rule of contract interpretation; *to wit*: that courts should "construe a contract to give legal effect to every provision therein," thus, "an interpretation which gives a reasonable, lawful, and effective meaning to all contractual terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." *Commonwealth v. UPMC*, 634 Pa. 97, 141-42 (2015) (quoting Restatement of Contracts (2d) § 203(a)). In applying this principle, if Section 5's phrasing that the restrictive covenants shall remain in effect for a period of "one year after the date Employee's employment with [EMC] ends or is terminated for any reason[,]" was interpreted to mean that the restrictive covenants were in effect regardless of whether Stuart's employment was ended by her employer (EMC) or by herself, then Section 12—in its entirety—would have no meaning. Accordingly, this Court cannot endorse said interpretation, for it would render another entire provision meaningless. In contrast, interpreting the provisions of Section 12 and Section 5 as detailed above gives meaning to both provisions. Therefore, such interpretation is favored.

Lastly, even if there was no interpretation that would give meaning to both provisions (which, as described above, there is), the principle of contract interpretation regarding the superiority of negotiated terms also supports this Court's plain meaning interpretation. The Restatement (Second) of Contracts § 203(d) provides that "separately negotiated or added terms are given greater weight than standardized terms or other terms not separately negotiated." Restatement of Contracts (2d) § 203(d); *see also Spatz v. Nascone*, 283 Pa. Super. 517, 534-35 (Pa. Super. 1981) (quoting this provision of the Restatement as a guideline to be used in contract

interpretation).  Here, the undisputed facts demonstrate[6] that Section 5 was a standard term included in EMC's default employment contract, whereas Section 12 was specifically negotiated between the parties and added to Stuart's contract alone.[7]  Thus, the terms of Section 12 again prevail over any apparently contradictory terms in Section 5.  Further, the principle of *contra proferentem* dictates that any ambiguities in a contract should be construed against the drafter, here, EMC.[8]  *See Smith v. Windsor Group*, 750 A.2d 304, 308 (Pa. Super. Ct. 2000); *see also Rusiski v. Pribonic*, 515 A.2d 507, 510 (1986) ("assuming *arguendo* that there was ambiguity, doubtful language is construed most strongly against the drafter thereof.").

In sum, this Court finds that the phrase at issue in Section 12 is unambiguous and provides that the restrictive covenants detailed in Section 5 only apply after Stuart's employment with EMC has ended *if Stuart, herself, ended that employment relationship*.  Alternatively, to the extent that the plain meaning of Section 12 contradicts part of Section 5 and said inconsistency creates an ambiguity, all applicable canons of contract interpretation support this Court's finding under the

---

[6]     While this Court could not and did not consider extrinsic evidence regarding *the meaning of the phrase itself* in Section 12 (because Section 12's terms are unambiguous), having found in the alternative that an ambiguity may exist due to the inconsistency between Section 12 and Section 5, this Court may consider extrinsic evidence in order to resolve that particular, narrowly-defined ambiguity.  *See Wert*, 633 Pa. at 279 ("Parol evidence is only admissible to resolve ambiguities[.]"); *Yocca*, 578 Pa. at 498 ("where a term in the parties' contract is ambiguous, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is created by the language of the instrument or by extrinsic or collateral circumstances.") (internal quotations omitted).

[7]     EMC's President, Jennifer Horrocks, testified that Stuart's employment agreement "had a different form[,]" referring to Section 12 of Stuart's employment agreement.  Def. Br., ECF 107, Ex. E (Horrocks Dep.), at 32.  EMC's owner, Betsy McLarney, also testified that Stuart's employment agreement was "modified" regarding the restrictive covenants.  Def. Br., ECF 107, Ex. D (McLarney Dep.), at 78.  *See also*, *generally*, Def. Br., ECF 107, Ex. G (Email from Loren Casuto, Esq. to Stuart) and Plf. Resp. Br., Ex. 18, ECF 110-4 (emails between Stuart and EMC's General Counsel, Loren Casuto, as they negotiated changes to EMC's standard, initially-proposed employment contract, specifically regarding the restrictive covenants and the inclusion of Section 12).

[8]     *See* Def. Br., ECF 107, Ex. G (Email from Loren Casuto, Esq. to Stuart) and Plf. Resp. Br., Ex. 18, ECF 110-4 (emails in which EMC's General Counsel, Loren Casuto, discussing his drafting process and sends a final copy of the employment contract he wrote for Stuart to Stuart).

plain meaning interpretation and, further, prohibits this Court from endorsing EMC's argued interpretation.

Applying this settled contractual interpretation to the undisputed facts in this case, this Court finds that EMC cannot establish that Stuart breached her employment contract. As noted, EMC's contract claim is premised on its contention that Stuart breached the non-solicitation and non-compete clauses of her employment agreement after she was terminated. As determined above, those covenants only apply if Stuart resigned/quit her employment, not if EMC terminated Stuart's employment. There is no dispute that EMC terminated Stuart's employment.[9] Therefore, the restrictive covenants were not in effect when Stuart engaged in the conduct alleged and, thus, her alleged conduct cannot constitute a breach of those covenants. Because EMC cannot establish this necessary element of its breach of contract claim against Stuart, Defendants' motion for summary judgment is granted on this claim.

### II: Count II- Defend Trade Secret Act, Misappropriation of Trade Secrets

At Count II of the amended complaint, EMC asserts a federal misappropriation of trade secrets claim against Defendants under the Defend Trade Secret Act, 18 U.S.C. § 1836, *et seq*., ("DTSA"). The DTSA provides a civil right of action for trade secret owners whose trade secrets

---

[9]     EMC attempts to argue that Stuart "self-terminated" herself from EMC by performing so poorly that "her willful misconduct left EMC with no choice but to terminate her employment[.]" Plf. Resp. Br., ECF 110, at 6. Initially, it is worth acknowledging this concession that EMC did, indeed, terminate Stuart's employment. Second, this Court agrees with Stuart that EMC presents no evidence that such a concept has ever been recognized as a legal theory. Indeed, this Court is similarly unaware, as Defendants note that they are, "of any published decision by any court finding an employee's work performance (as opposed to a job abandonment and simply not appearing for work) could constitute a 'self-termination' that would convert an involuntary termination into a voluntary one." Def. Br., ECF 107 at 17 n.5.

Further, contrary to EMC's contentions, it is irrelevant whether Stuart's work performance was poor (intentionally or unintentionally so) prior to her termination, or whether she had been hoping to be fired. The reasons why EMC fired Stuart are equally irrelevant. The only relevant, material fact regarding Section 12's applicability is which party ended Stuart's employment: EMC or Stuart? The record is clear that it was EMC.

13

are misappropriated, "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). The DTSA defines "misappropriation" as follows:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who—(i) used improper means to acquire knowledge of the trade secret; (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—(I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that—(I) the trade secret was a trade secret; and (II) knowledge of the trade secret had been acquired by accident or mistake[.]

18 U.S.C. § 1839(5). Of these possible grounds for misappropriation, EMC alleges that Stuart committed the second type: disclosure or use of EMC's trade secrets, in the form of client information, without EMC's expressed or implied consent.[10] As to Grandesign, EMC alleges that Grandesign committed the first type: acquisition of EMC's trade secrets where Grandesign knew, or had reason to know, that the trade secrets were acquired by improper means, in the form of acquiring EMC's trade secrets from Stuart.[11] This Court will first address this misappropriation claim against Stuart.

---

[10]      EMC alleges that Pittera committed this same type of misappropriation. However, this Court finds that there are genuine issues of material fact pertaining to this claim against Pittera and, as such, must deny Pittera's motion for summary judgment on said claim. Accordingly, this Court will not address the details of said claim against Pittera in detail in this opinion.

[11]      EMC also alleges that Grandesign committed this type of misappropriation in the form of acquiring EMC's trade secrets from *Pittera*. As indicated *supra* n.10, this Court is denying Pittera's motion for summary judgment on the DTSA claim against her, and, therefore, this Court is also denying Grandesign's motion for summary judgment on the DTSA claim against it *to the extent that the claim is based on any trade secrets Grandesign may have acquired from Pittera*. Thus, this Court will not address said claim in detail in this opinion.

*Misappropriation Claim against Stuart*

EMC alleges that Stuart used or disclosed EMC's client information in the following three instances:[12] (1) providing Grandesign information contained in a proposal EMC submitted to a prospective client, Pegasystems, for a media campaign (specifically, a map with marked locations), which Grandesign then used to submit an identical map with its own proposal to Pegasystems;[13] (2) authoring a proposal while employed at EMC for a client's potential media projects and then, a few weeks later once she was employed at Grandesign, sending an identical version of the proposal to the same intended client, on Grandesign's behalf;[14] and (3) contributing to a proposal while employed at EMC for an experiential event for Pegasystems and then later, once employed at Grandesign, submitting a nearly-identical proposal to Pegasystems (with the substantial difference being that Grandesign's version cost less), on Grandesign's behalf.[15]

In viewing the evidence in the light most favorable to the non-movant (here, EMC), this Court will also assume, for the sake of this motion only, that the client information qualifies as a trade secret under applicable law, and that Stuart used and/or disclosed client information in each of the factual scenarios alleged by EMC in its motion,[16] the only remaining element to establish is the misappropriation itself.

---

[12]     Notably, in its response, EMC did not point out these instances to the Court.  In fact, EMC did not respond at all to Defendants' argument that the record was devoid of any evidence that any of Defendants disclosed or used EMC's trade secrets "through unlawful means or under circumstances under which [she] knew the information was improperly obtained."  Def. Br., ECF 107 at 23.  These three instances were identified by the Court after independent review of EMC's Statement of Undisputed Material Facts *filed in support of its own, separate motion for summary judgment*.  *See* ECF 108-2.

[13]     Plf. Statement of Undisputed Material Facts, ECF 108-2 at ¶ 59-62.

[14]     Plf. Statement of Undisputed Material Facts, ECF 108-2 at ¶ 64.

[15]     Plf. Statement of Undisputed Material Facts, ECF 108-2 at ¶ 66.

[16]     This Court makes these assumptions in accordance with its obligation to view the evidence in the light most favorable to the non-movant (here, EMC).  *Galena*, 638 F.3d at 196.

Stuart argues that there is no evidence that she disclosed or used client information "through unlawful means or under circumstances under which [she] knew the information was improperly obtained[,]" Def. Br., ECF 107 at 23, and, thus, EMC cannot establish the essential element of misappropriation.  This Court agrees.

For each of the three factual scenarios, this Court must determine whether any of the three subsections of the second type of misappropriation, could possibly be established by the record. Specifically, Subsection (B)(i) requires that Stuart have "used improper means to acquire knowledge of the trade secret[.]"  18 U.S.C. § 1839(5)(B)(i).  The alleged client information disclosed and used was acquired by Stuart during the course of her employment with EMC. Therefore, none of it was improperly acquired; rather, it was acquired in the regular course of her employment, with EMC's consent.  Accordingly, EMC has not shown—and cannot show—that subsection (B)(i) applies here.

Subsection (B)(ii) requires that at the time Stuart disclosed or used the client information, she knew or had reason to know that her knowledge of the client information was either "(I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret[.]" 18 U.S.C. § 1839(5)(B)(ii).  Stuart gained knowledge of the client information directly, and since she did not use improper means to acquire that knowledge, subsection (B)(ii)(I) does not apply.  Also due to Stuart's direct acquisition of that knowledge, because there was no third party involved who imparted the knowledge from EMC to Stuart, subsection (B)(ii)(III) does not apply.

Subsection (B)(ii)(II) requires that Stuart acquired the client information "under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret[.]" 18 U.S.C. § 1839(5)(B)(ii)(II). Because Stuart acquired the knowledge of the client information in the course of her employment with EMC, EMC argues that Stuart had a duty to maintain the secrecy of the client information pursuant to the terms of her employment contract and the terms of EMC's Employee Handbook (the "Handbook"). Thus, to determine whether the record could establish misappropriation under this Subsection (B)(ii)(II), this Court must look to the scope of Stuart's duty under the two sources that EMC identifies: Stuart's employment contract and the Handbook.

Under Stuart's employment contract, Stuart had a duty to, as EMC summarized, "hold in confidence and protect EMC's trade secrets and confidential information[.]" Plf. Resp. Br., ECF 110 at 13. A review of the document itself reveals that said duty is derived from Section 5 of Stuart's employment contract, which, as explained above, details several protective covenants. However, as previously explained, the scope of Stuart's Section 5 duties is informed and limited by Section 12. Specifically, Stuart's Section 5 duties ceased when EMC fired Stuart on October 25, 2017. *See supra* Section I. Thus, while Stuart did acquire the client information "under circumstances giving rise to a duty to maintain the secrecy" thereof, that duty—as sourced from her employment contract—only required Stuart to maintain the secrecy of the client information *while she was employed at EMC*, or after she left EMC's employ *if she resigned*. Therefore, because all of Stuart's conduct in the three alleged factual scenarios occurred *after* EMC terminated her, Stuart did not violate any duty sourced from her employment contract when she engaged in that conduct.

EMC also argues that Stuart had a duty based on the Handbook.  Stuart signed an agreement to abide by the terms and conditions of the Handbook (the "Handbook Agreement").  Pertinently, the Handbook Agreement provided: "if a written contract is inconsistent with the Employee Handbook, the written contract is controlling."  Plf. Resp. Br., Ex. 1, ECF 110-2, at 10. Accordingly, the terms of Stuart's employment contract regarding protective covenants supersede any related guideline in the Handbook.  Since Stuart's duties from the protective covenants ceased upon her termination by EMC, any related guidelines in the Handbook would not survive her termination either.  While it is possible that some provisions of the Handbook may have applied during the course of Stuart's employment with EMC, none of Stuart's alleged conduct in the three factual scenarios argued occurred during the course of her employment.  Therefore, Stuart did not violate any duty sourced from the Handbook when she engaged in the alleged conduct. Accordingly, because Stuart's alleged conduct in the three factual scenarios did not violate a duty imposed by either her employment contract or the Handbook, subsection (B)(ii)(II) of the DTSA's misappropriation definition does not apply.

The final subsection—subsection (B)(iii)—requires that Stuart disclosed or used the client information at a time "before a material change in [her] position" and that, at the time she disclosed or used the client information, she either knew or had reason to know two things: (1) that "the [client information] was a trade secret" *and* (2) that her knowledge of the client information "had been acquired by accident or mistake[.]"  18 U.S.C. § 1839(5)(B)(iii).  As explained above, Stuart did not acquire knowledge of the client information by accident or mistake; rather, she acquired it during the regular course of her employment, with EMC's consent.  Therefore, subsection (B)(iii) also does not apply.

Because none of the three subsections of the second type of misappropriation could possibly be established by the record for any of the three factual scenarios alleged, EMC cannot establish the essential element of misappropriation required for its DTSA claim against Stuart. Accordingly, Defendants' motion for summary judgment is granted on that claim against Stuart.

*Misappropriation Claim against Grandesign*

As to EMC's federal misappropriation claim against Grandesign, EMC alleges that Grandesign acquired EMC's trade secrets from Stuart in the same three factual scenarios described above in the analysis of the DTSA claim against Stuart.  Again assuming, for the sake of this motion only, that the client information qualifies as a trade secret under applicable law, and that Stuart did use or disclose client information in each of the factual scenarios, the remaining element to be shown is misappropriation itself.  Grandesign argues that the record contains no evidence that it acquired EMC's client information "through unlawful means or under circumstances under which [it] knew the information was improperly obtained[,]" Def. Br., ECF 107 at 23; thus, EMC cannot establish the essential element of misappropriation.  This Court agrees with Grandesign, to the extent that the DTSA claim is based on trade secrets Grandesign may have acquired *from Stuart*.

To establish misappropriation by Grandesign, EMC would need to show that Grandesign knew or had reason to know that the client information "was acquired by improper means[.]"  18 U.S.C. § 1839(5)(A).  As previously explained in the analysis of the DTSA claim against Stuart, Stuart did not acquire the client information by improper means.  As such, Grandesign cannot be charged or held to have known or have reason to know that the client information was acquired by improper means.  Accordingly, EMC cannot establish the essential element of misappropriation for its DTSA claim against Grandesign, to the extent that said claim is based on trade secrets

19

Grandesign may have allegedly acquired *from Stuart*. Thus, Defendants' motion for summary judgment is granted on this claim against Grandesign, *to that limited extent only*.

### III: Count III- Pennsylvania Uniform Trade Secrets Act, Misappropriation of Trade Secrets

At Count III of the amended complaint, EMC asserts a state law misappropriation of trade secrets claim against Defendants based on the same purported facts and evidence underlying its federal misappropriation claims detailed above. Under the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa. Cons. Stat. § 5301 *et seq*., "to establish misappropriation of a trade secret, the plaintiff must show that the defendant used or disclosed information that it knew or had reason to know was a trade secret and that the defendant acquired such information by improper means." *Hill v. Best. Med. Int'l, Inc.*, 2011 U.S. Dist. LEXIS 123845, at *39 (citing 12 Pa. Cons. Stat. § 5302). Specifically, the PUTSA defines "misappropriation" as follows:

> (1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was: (A) derived from or through a person who had utilized improper means to acquire it; (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

12 Pa. C.S. § 5302. Of these possible grounds for misappropriation, EMC alleges that Stuart committed the second type: disclosure or use of EMC's trade secrets, in the form of client information, without EMC's consent.[17] EMC further alleges that Grandesign committed the first

---

[17] EMC alleges that Pittera committed this same type of misappropriation. However, this Court finds that there are genuine issues of material fact pertaining to this claim against Pittera and, as such, must deny Pittera's motion for summary judgment on said claim. Accordingly, this Court will not address the details of said claim against Pittera in detail in this opinion.

type: acquisition of EMC's trade secrets where Grandesign knew, or had reason to know, that the trade secrets were acquired by improper means, in the form of acquiring EMC's trade secrets from Stuart.[18]

As noted, EMC alleges that Stuart and Grandesign violated the PUTSA based on the same purported facts and evidence as those underlying its DTSA claims against them. Construing the same facts in EMC's favor, the only remaining element at issue is, again, the misappropriation itself. Stuart and Grandesign make the same arguments here as they did for the DTSA claims. The elements for misappropriation under the PUTSA are substantively identical to the elements for misappropriation under the DTSA. *See Herley Indus. V. R Cuber Eng'g. LLC*, 2021 U.S. Dist. LEXIS 11949, at *11 (E.D. Pa. Jan. 22, 2021) ("The standard for 'misappropriation' applicable to the present case is identical under both the DTSA and PUTSA. *See* 18 U.S.C. § 1839(5)(B); 12 Pa. Cons. Stat. § 5302(2)[.]"). Therefore, this Court's previous analysis also applies, and is incorporated, here. Necessarily, this Court reaches the same conclusion as it did with the DTSA claims: none of the avenues to prove misappropriation could possibly be established by the record for any of the three factual scenarios EMC alleges. Therefore, EMC cannot establish the essential element of misappropriation for its PUTSA claims against Stuart or Grandesign. Accordingly, Defendants' motion for summary judgment is granted as to the PUTSA claims against Stuart, and against Grandesign to the extent that said claim is based on trade secrets Grandesign may have acquired *from Stuart*.

---

[18]    EMC also alleges that Grandesign committed this type of misappropriation in the form of acquiring EMC's trade secrets from *Pittera*. As indicated *supra* n.17, this Court is denying Pittera's motion for summary judgment on the PUTSA claim against her, and, therefore, this Court is also denying Grandesign's motion for summary judgment on the PUTSA claim against it *to the extent that the claim is based on any trade secrets Grandesign may have acquired from Pittera*. Thus, this Court will not address the details of said claim in detail in this opinion.

#### *IV: Count VI- Breach of Fiduciary Duty*

At Count VI of the amended complaint, EMC asserts a breach of fiduciary duty claim against Stuart and Pittera.  "Under Pennsylvania law, a breach of fiduciary claim has the following elements: (1) the existence of a fiduciary relationship between the plaintiff and the defendant; (2) the defendant's negligent or intentional failure to act in good faith and solely for the plaintiff's benefit in all matters for which the defendant was employed; and (3) the plaintiff was injured by the defendant's failure to act solely for the plaintiff's benefit."  *Greco v. SubGallagher Inv. Trust*, 2020 U.S. Dist. LEXIS 134180, at *8-9 (E.D. Pa. July 29, 2020) (citing *Snyder v. Crusader Servicing Corp*., 231 A.3d 20, 31 (Pa. Super. Ct. 2020)).  Here, Defendants argue that there is no evidence that (1) either Stuart or Pittera had a fiduciary relationship with EMC, or (2) Stuart or Pittera acted in any way that breached a fiduciary duty, if one existed.[19]   In response, EMC contends that both former employees had a fiduciary duty by way of a "confidential relationship" with EMC and that they "abused [EMC's] trust."  Plf. Resp. Br., ECF 110 at 26.

---

[19]     Defendants also argue that EMC's breach of fiduciary duty claim, among others, is preempted by the PUTSA.  While Defendants are correct that the PUTSA may preempt some tort claims, as the Honorable Kim R. Gibson concisely explained:

> With regard to Defendants' preemption argument . . . it would be inappropriate to dismiss Plaintiff's common law claims at the summary judgment stage, because Plaintiff properly pleaded these claims in the alternative to its claim for misappropriation of trade secrets under the PUTSA.  *See PNC Mortg.*, 2012 U.S. Dist. LEXIS 25276, 2012 WL 628000, at *15 ("Tort claims that may or may not be preempted by the PUTSA are not dismissed at the summary judgment stage. Instead, the question of whether certain tort claims are preempted comes only after the jury has determined whether Defendants are liable for misappropriation of trade secrets.") (citing *Bro-Tech Corp*., 651 F.Supp.2d at 412 (denying summary judgment on PUTSA claim and noting that tort claims predicated on misappropriation of trade secrets may be preempted if and when the defendants were found at trial to have misappropriated trade secret information)).

*Avanti Wind Sys. v. Shattell*, 2016 U.S. Dist. LEXIS 75406, at *57 (W.D. Pa. June 9, 2016).

"A fiduciary duty may arise from a confidential relationship between two parties." *Parks Miller v. Ctny. of Ctr.*, 702 F. App'x 69, 72 (3d Cir. 2017) (quoting *PTSI, Inc. v. Haley*, 71 A.3d 304, 311 (Pa. Super. Ct. 2013)) (internal quotations omitted).

> The essence of a confidential relationship is trust and reliance on one side, and a corresponding opportunity to abuse that trust for personal gain on the other. Accordingly, a confidential relationship appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed.

*PTSI, Inc. v. Haley*, 71 A.3d 304, 311 (Pa. Super. Ct. 2013) (internal alterations, quotations, and citations omitted). The parties disagree as to whether Stuart and Pittera had a fiduciary duty, based on a confidential relationship with EMC or otherwise. However, this Court need not resolve that dispute because even assuming that Stuart and Pittera did have a fiduciary duty to EMC,[20] this Court agrees with Defendants that EMC has failed to present evidence sufficient to establish the essential element of breach of fiduciary duty by either Stuart or Pittera.

In its response, EMC's only contention regarding Stuart's and Pittera's alleged conduct constituting a breach of fiduciary duty is that Stuart and Pittera "abused [EMC's] trust." Plf. Resp. Br., ECF 110 at 26. Such a vague, conclusory statement does not provide any evidence to satisfy EMC's burden. Nevertheless, even in EMC's Statement of Undisputed Material Facts filed in support of its own, separate motion for summary judgment, the only conceivably related facts that pertain to Pittera's conduct while employed by EMC are that: (1) about two months before Pittera resigned from EMC, she "had multiple meetings with, and exchanged emails with, Grandesign employees[,]" Plf. Statement of Undisputed Material Facts, ECF 108-2 at ¶ 33; and (2) EMC sent Pittera a letter a few months after she had left EMC, in which EMC, *inter alia*, "expressed concerns that Pittera apparently deleted information from EMC's servers in advance of her resignation." *Id.*

---

20    *See supra* n.16.

at ¶ 46.  Neither of these purported facts indicate that Pittera breached a fiduciary duty to EMC.  Evidence that Pittera communicated with employees at another company does not *alone* create an inference of wrongful conduct.  Similarly, a letter indicating that EMC once *accused* Pittera of certain conduct is not itself evidence of the alleged underlying conduct itself.  Thus, the evidence EMC cites falls far short of showing a breach by Pittera.

Regarding Stuart, the only conceivably related fact in EMC's Statement of Undisputed Material Facts that pertains to Stuart's conduct while employed by EMC is the statement that Stuart "had been in discussions about a position with Grandesign before her employment with EMC ended[,]" *id.* at ¶ 54, which cites to a series of texts from Pittera to Stuart that could support such an inference.  "The case law, however, is clear that an employee may make preparations to compete and schedule appointments for a new business prior to termination of employment."  *PTSI, Inc.*, 71 A.3d at 310 (citing *New L&N Sales & Mktg. v. Menaged*, 1998 U.S. Dist. LEXIS 14008, at *23 (E.D. Pa. Sept. 9, 1998) ("under the law of Pennsylvania employees at will do not breach a fiduciary duty to the employer by making preparations to compete upon termination of employment provided the employee does not use the confidential information of his employer, solicit the customers of his employer, or otherwise engage in conduct directly damaging his employer during the period of employment." (internal quotations and citations omitted))).  Therefore, the mere fact that Stuart communicated with a potential future employer, without more, does not establish, or support an inference, that Stuart breached a fiduciary duty to EMC.

Because EMC has failed to make a showing sufficient to establish the existence of an element essential of its breach of fiduciary duty claim—namely, the breach of such a duty — Defendants' motion for summary judgment is granted with respect to these claims against Stuart and Pittera.

24

### *V: Count VIII- Defamation*

At Count VIII of the amended complaint, EMC asserts a defamation claim only against Stuart.  To assert a claim for defamation under Pennsylvania law, a plaintiff must establish the following: the communication's (1) defamatory character, (2) publication by the defendant, and (3) application to the plaintiff; the understanding by the recipient of (4) the communication's defamatory meaning and (5) the communication as intended to be applied to the plaintiff; (6) special harm to the plaintiff resulting from publication of the communication; and (7) abuse of a conditionally privileged occasion.  42 Pa. Cons. Stat. § 8343(a).  Stuart argues that "[t]here is no evidence of record of any defamatory comment made by Stuart about EMC that would constitute defamation."  Def. Br., ECF 107 at 30.  In response, EMC points to two communications that it alleges create an inference of defamation.  Plf. Resp. Br., ECF 110 at 27.

The first communication that EMC cites to is Stuart's statement to other EMC employees that "all of our hard work is for [EMC Owner] Betsy [McLarney]'s gratification or benefit."  Plf. Resp. to Def. Statement of Facts, ECF 110-1, at ¶ 44.  A "communication is defamatory if it ascribes to another conduct, character or a condition that would adversely affect his fitness for the proper conduct of his lawful business, trade or profession."  *Dougherty v. Boyertown Times*, 547 A.2d 778, 783 (Pa. Super. Ct. 1988) (internal quotations and citations omitted).  Here, this Court agrees with Stuart that this communication is not defamatory, as a matter of law, because it does not have any defamatory character and it is a non-actionable opinion.[21]  Quite simply, Stuart's statement that all of EMC's employees' work is for the company owner's "gratification and benefit" does not ascribe any conduct, character, or condition to that owner that would adversely affect her "fitness for the proper conduct of [her] lawful business, trade[,] or profession."  *Id.*

---

[21]      An opinion can be an actionable communication "only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion."  *Dougherty*, 547 A.2d at 785.

The second communication EMC cites is that "Stuart was 'bad-mouthing the company' during sales conferences[.]" Plf. Resp. to Def. Statement of Facts, ECF 110-1, at ¶ 45. This alleged "communication" is so vague that it cannot be assessed as having a potentially defamatory nature. EMC has not identified any specific statements that Stuart made in which she was "bad-mouthing" the company. Merely identifying a *type* of communication (*i.e.*, "bad-mouthing") is insufficient to identify an actual, specific communication or statement made by the defendant. As such, this second "communication" is incapable of constituting defamation, as a matter of law. *See Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 480 (E.D. Pa. 2010) ("Under Pennsylvania law, the Court acts as a gatekeeper to determine whether the statements are incapable of defamatory meaning in deciding whether any basis exists to proceed to trial." (citing *Tucker v. Phila. Daily News*, 848 A.2d 113, 123-24 (Pa. 2004)).

Thus, contrary to EMC's bald contention that "[w]hen viewed in a light favorable to EMC, the record evidence creates an inference that Stuart defamed EMC and its leadership[]" by way of the two identified communications, neither cited communication is defamatory, as a matter of law. As such, EMC has not made a showing sufficient to establish the existence of an essential element of its defamation claim—namely, the existence of a defamatory communication. Accordingly, Defendants' motion for summary judgment is granted on this claim.

### VI: Count XI- Unjust Enrichment

At Count XI of the amended complaint, EMC asserts an unjust enrichment claim against Defendants.[22] To maintain a claim for unjust enrichment in Pennsylvania, a plaintiff must establish that: "(1) plaintiff conferred a benefit on the defendant; (2) the defendant appreciated the benefit;

---

[22]     EMC asserts this claim against Pittera and Stuart, as well. However, this Court finds that there are genuine disputes of material fact pertaining to this claim against Pittera and Stuart, and, as such, must deny their motion for summary judgment on said claims. Accordingly, this Court will not address the unjust enrichment claims against Pittera and Stuart in detail in this opinion.

and (3) acceptance and retention by the defendant of the benefits, under the circumstances, would make it inequitable for the defendant to retain the benefit without paying for the value of the benefit." *Commonwealth v. TAP Pharm. Prods.*, 885 A.2d 1127, 1137 (Pa. Commw. Ct. 2005). Grandesign argues that the record shows that EMC did not confer any benefit upon Grandesign.[23] In response, EMC contends that "Grandesign *was aware* of the unlawful actions taken by Stuart and Pittera (e.g., to induce EMC's employees to resign their employment and to solicit EMC customers, prospective customers, and vendors). Therefore, evidence in the record shows that Stuart and Pittera have furthered their own interests, as well as those of Grandesign, on the back of benefits conferred on them by EMC." Plf. Resp. Br., ECF 110 at 25 (emphasis added). While Stuart and Pittera may have furthered Grandesign's interests along with their own through their alleged unlawful actions, that does not mean that EMC conferred a benefit on Grandesign. To the contrary, that theory implies the logical inference that *Stuart and Pittera* conferred a benefit on Grandesign, one that they had initially received from EMC. There is no evidence in the record indicating that EMC actually conferred a benefit *on Grandesign*, as the elements of unjust enrichment require.

Notably, "[t]he doctrine [of unjust enrichment] does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff." *Styer v. Hugo*, 422 Pa. Super. 262, 268 (Pa. Super. Ct. 1993). Indeed, the circumstances present here are similar to those in *Meehan v. Cheltenham Township*, 410 Pa. 446 (1963), which the *Styer* court summarized as "two parties enter into contract which ultimately benefits third party . . . in absence of misleading by third party[,] there is no right to restitution against third party to remedy contracting party's

---

[23]     Grandesign also argues that EMC's unjust enrichment claim is preempted by the PUTSA.  As explained *supra*, although some claims may be preempted by the PUTSA, it is inappropriate to dismiss such claims at the summary judgment stage when they are pled in the alternative.  *See supra* n.19.

breach; although [the] third party is enriched, [the] enrichment [is] not deemed unjust[.]" *Styer*, 422 Pa. Super. at 268.   Here, EMC's unjust enrichment claim against Stuart and Pittera, if successful, would establish an implied or quasi-contract, *see id*., and Grandesign is the third party that allegedly benefited from Stuart's and Pittera's breach of their implied contract with EMC. Thus, as in *Meehan*, absent any evidence of Grandesign misleading EMC, EMC has no right to restitution against Grandesign.   Though Grandesign may arguably have been enriched indirectly, such enrichment is not "deemed unjust."  *Id*.; *see also Amin v. Pocono Med. Ctr*., 2013 Pa. Super. Unpub. LEXIS 3485, at *28-29 (Pa. Super. Ct. Oct. 4, 2013) (summarizing the consensus among precedent that when the allegation of unjust enrichment is against a third party that indirectly benefitted from a contract between two other parties, "the law requires that the third party have specifically requested the benefit or misled the plaintiff.").

The record is devoid of any evidence that Grandesign either requested the alleged benefit from EMC, or misled EMC in any way that resulted in Grandesign realizing a benefit from EMC. Further, all of the benefits EMC points to having conferred on Defendants are benefits conferred on Stuart and Pittera as individuals.   Therefore, even if Grandesign did indirectly benefit from EMC through Stuart and Pittera, such a benefit is not unjust, as Grandesign is merely a third party. Accordingly, EMC cannot satisfy the elements of an unjust enrichment claim against Grandesign, and Defendants' motion for summary judgment is granted on this claim against Grandesign.

### VII: All Remaining Counts

As noted, Defendants also move for summary judgment on all remaining counts (Count I; Count II against Pittera and against Grandesign to the extent that any such claims are based on alleged trade secrets that Grandesign would have acquired *from Pittera*; Count III against Pittera and against Grandesign to the extent that any such claims are based on alleged trade secrets that

Grandesign allegedly acquired *from Pittera*; Count V; Count VIII; Count IX; Count X; Count XI against Stuart and Pittera *only*; and Count XII).  As noted, Defendants are the movants and, thus, bear the burden of identifying evidence that "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323; *see also UPMC Health Sys.*, 391 F.3d at 502.  This Court finds that Defendants have failed to meet that burden regarding these remaining counts, as review of the record reveals several genuine disputes of material facts essential to resolving those claims.  For example, factual disputes exist as to, *inter alia*: (1) whether the various confidential information EMC contends constitutes trade secrets does, indeed, constitute trade secrets; (2) whether Stuart accessed a protected computer and, if so, whether she did so with intent to defraud; (3) the reasonableness of the likelihood that but for Defendants' alleged interference with EMC's prospective contracts with its clients, EMC would have secured said contracts; and (4) whether Defendants acted in concert with malicious intent to harm EMC.  In addition, several of EMC's claims are pled in the alternative and the question of whether some of those claims are preempted by the PUTSA can only be resolved after a fact-finder has determined whether the alleged information constitutes a trade secret under the applicable statutes and whether Defendants are liable for misappropriation of those trade secrets (neither of which are undisputed at this stage). *See supra* n.19.  Accordingly, Defendants' motion for summary judgment is denied with respect to the remaining counts (listed above).

**CONCLUSION**

For the reasons stated herein, Defendants' motion for summary judgment is granted, *in part*, and denied, *in part*, as set forth in the accompanying Order.

*NITZA I. QUIÑONES ALEJANDRO*, U.S.D.C. J.